**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **SANTIAGO QUINTERO, individually and** | § | |
| **as heir to PAUL QUINTERO, and as** | § | |
| **administrator of and on behalf of** | § | |
| **the estate of PAUL QUINTERO, and on** | § | |
| **behalf of all heirs of PAUL QUINTERO** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **V.** | § | **CASE NO. _____** |
| | § | |
| **CITY OF WICHITA, KANSAS;** | § | |
| **and OFFICER JANE DOE, in her** | § | |
| **Individual and Official Capacity** | § | |
| | § | |
| | § | |
| **Defendant** | § | |

## PLAINTIFF'S COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COMES **Santiago Quintero,** individually and as heir to Paul Quintero, deceased, and as administrator of and on behalf of the estate of Paul Quintero, and on behalf of all heirs of Paul Quintero, Plaintiff herein, and files this, his Complaint against **The City of Wichita, Kansas** and **Officer Jane Doe**, in her individual and official capacities, Defendants, and for cause of action would respectfully show this Court as follows:

## I. SUMMARY

1. As a direct result of the policies, practices, customs and procedures of the City of Wichita ("City"), Decedent John Paul Quintero ("Paul") was intentionally deprived of his

constitutional right to be free from unreasonable searches and seizures guaranteed to him by the United States Constitution. Defendant Jane Doe, a police officer acting in the course and scope of her employment with the City of Wichita and acting under color of state law, unjustifiably shot and killed Paul under circumstances where no reasonable police officer would have done so. Under clearly established law regarding excessive deadly force, the officer is not entitled to qualified or other immunity for these actions.

2.      Despite the unarmed, 23-year old Paul submitting to police instructions, despite Paul posing no reasonable immediate threat to the safety of any officer or to anyone else, and despite no officer issuing any warning to Paul, a City officer nonetheless fired his Taser at Paul, causing Paul—as such Tasers are designed and intended to do—to lose all neuromuscular control and the ability to perform coordinated actions.

4.      Unbelievably, just seconds later, as Paul's young body was still reacting involuntarily to the Taser's touted "Neuro Muscular Incapacitation," another Wichita Police officer shot Paul **_from behind_**, **_twice,_** in Paul's **_mid-section_**, using an **_AR-15 assault rifle_**, **_without warning_** even though Paul was **_not trying to flee or resist_** and even though Paul **_obviously did not pose any immediate threat_** to the safety of any officer or anyone else.

5.      As a result of the bullet wounds, Paul Quintero suffered and eventually died.

6.      The unnecessarily aggressive behavior and impulsive, reckless and excessive use of deadly force by the City police was entirely consistent with the Wichita Police Department's established training, practices, policies and customs.

7.      The City's longstanding policy, practice, custom and procedure of authorizing the use of deadly force in the absence of an actual immediate threat and/or longstanding policy,

practice, custom and procedure of ratifying, defending and hiding a police officer's excessive use of force was/were a moving force of Paul's shooting, injuries and death.

8.      The City's deliberate indifference to the obvious need for additional and different policies, training and supervision of its officers was a moving force of Paul's shooting, injuries and death.

9.      Plaintiff—Paul's father and also, tragically, a witness to the pointless shooting of his son—brings this action for damages against the City and against the officer who shot and killed Paul.

## II.  PARTIES

10.      Santiago Quintero ("Plaintiff") is the natural father of Paul Quintero and has been appointed as the administrator of the Estate of Paul Quintero, deceased.  Plaintiff brings this case on behalf of himself, on behalf of the Estate of Paul Quintero, and on behalf of all heirs of Paul Quintero. Paul Quintero was unmarried and had no children. The only heirs of Paul Quintero are his parents, including Plaintiff.  Plaintiff is a resident of Wichita, Kansas.

11.      The City of Wichita, Kansas ("City") is a city and municipality organized under the laws of the State of Kansas.

12.      Officer Jane Doe is unknown at this time. Part of the City's deadly force policy and custom is to formally and systematically attempt to protect the identity of its officers who shoot and kill or injure citizens. Plaintiff's formal requests for the identity of the officers involved and other information regarding the shooting death of his son have been denied.

### III. JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this action arising under the laws of the United States. Defendants' acts, omissions, and wrongful conduct violate civil rights protected by the federal constitution and are actionable herein pursuant to 42 U.S.C. § 1983.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391 because this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred and because this is the judicial district in which the City is located.

### IV. FACTS

**A.      Wichita and excessive force against unarmed, nondangerous citizens.**

16.     At all times material herein, the City's widespread practice, so well settled as to constitute custom or usage with force of law, was to authorize the use of deadly force whenever an officer could imagine a situation *potentially* escalating into an immediate and significant threat to the safety of an officer or others, *i.e.* to use deadly force whenever there is a *theoretical* threat-of-a-threat rather than only when there is an actual threat.

17.     The City's widespread practice, so well settled as to constitute custom or usage with force of law, authorizing the use of deadly force whenever an officer perceives a theoretical threat-of-a-threat rather than any actual threat was a moving force of the shooting, injuries and death of Paul.

18.     Further, at all times material herein, the City's widespread practice, so well settled as to constitute custom or usage with force of law, was to always approve, ratify and defend the use of deadly force by City police officers regardless of whether circumstances raised

questions about whether there had been any actual, immediate threat to safety by: (1) consistently and systematically failing to discipline, criticize or seek to change such conduct; (2) consistently and systematically failing to genuinely question or investigate the propriety of such conduct; and (3) consistently and systematically working to hide and protect from public disclosure the identity and role of officers involved in such conduct. The City's message to any officer considering whether to shoot to kill has been consistent and clear: you will not be meaningfully disciplined or criticized, you will not be seriously interrogated or investigated, and your role in the shooting will likely be kept secret.

19.     The City's widespread practice, so well settled as to constitute custom or usage with force of law, to not meaningfully punish or discipline officers for shooting (beyond the formality of a paid "administrative leave"), to not genuinely question or investigate the propriety of shooting, and to work to hide and protect from public disclosure the officer's identity and role in shooting was a moving force of the shooting, injuries and death of Paul.

20.     The City's training and supervision deficiencies contributed to the pattern and practice of the use of excessive and unreasonable force by the City's officers, including the officer who shot and killed Paul.

21.     The City failed to train its officers, including the officer who shot Paul, in specific skills needed to handle recurring and foreseeable situations, thus presenting obvious potential for constitutional violations.

22.     The City's widespread practice, so well settled as to constitute custom or usage with force of law, was for officers to approach potentially stressful situations aggressively and for

officers to resort to force and threats of force as the primary means to bring such situations under control, even in the absence of any show of force or threat of force from the suspect.

23.     As the City's officers were trained and encouraged to primarily rely on force and threats of force to bring stressful situations under control, the City's officers accordingly would routinely escalate situations in order to more rapidly "justify" the resort to threats of force and the use of force in order to bring the situation "under control."

24.     The City deemphasized and effectively discouraged de-escalation tactics as a means of approaching and interacting with a suspect in order to bring a stressful situation under control, even in the absence of any show of force or threat of force from the suspect involved.

25.     The City effectively equated de-escalation tactics with the "hesitation" to use deadly force that the City taught officers to avoid, and the City made no reasonable attempt to train officers in the use of de-escalation tactics.

26.     The City is far more concerned with protecting itself and its officers from a lawsuit rather than protecting the citizens of Wichita.

27.     The City's approach to the use of deadly force by officers was to attempt to design a regime that looks appropriate and "constitutional" ***on paper*** despite the City's knowledge that—given the actual training, practices, procedures and customs of the City—the City's officers likely have used, were using, and would again use deadly force even in the absence of any actual, immediate threat to the safety of any officer or anyone else.

28.     To the extent the City made efforts to alter the City's policies and procedures regarding the use of deadly force, the primary focus on such efforts was to avoid legal and

6

financial liability for the use of deadly force by officers and not the prevention of unnecessary use of deadly force by officers.

29.     Years before Paul was shot and killed, the City moved away from emphasizing a relatively conservative "continuum of force" approach (whereby officers were taught to gradually increase the level of force in response to the level of force used by a suspect) to a shoot-first-ask-questions-later approached called "threat assessment."

30.     The City moved away from emphasizing a relatively conservative "continuum of force" approach because such a continuum approach was deemed to complicate post-shooting efforts by officers to create a paper trail purporting to justify the use of deadly force; in short, it was often difficult for officers to adequately explain a sudden jump across the continuum to deadly force.

31.     The City's move away from emphasizing a relatively conservative "continuum of force" approach was not taken to help officers more effectively police and serve the community and was not taken to help officers make more appropriate decisions regarding the use of deadly force.

32.     The City's move away from emphasizing a relatively conservative "continuum of force" approach—and to instead employ a significantly more subjective and impossibly vague, so-called "threat assessment" approach—was done because it was deemed to make it easier for officers to create a post-shooting paper trail that would appear to fit within written polices and procedures and thus supposedly make it easier to defend against claims of excessive use of force.

33.    The result of the City's move away from a relatively conservative "continuum of force" approach and to a so-called "threat assessment" approach further reinforced the City's widespread practice, so well settled as to constitute custom or usage with force of law, to authorize the use of deadly force whenever an officer could imagine a situation *potentially* escalating into an immediate and significant threat to the safety of an officer or others, *i.e.* to use deadly force whenever there is a perceived threat-of-a-threat rather than an actual, immediate threat.

34.    Together with and as a part of the move toward a so-called "threat assessment" approach to the use of force:

a.    The City instructed officers never to hesitate to use deadly force or they will be killed.

b.    The City instructed officers not to wait for an actual assault to use deadly force because that may be too late: "hesitation is tragic."

c.    The City encouraged officers not to hesitate to shoot even unarmed subjects by emphasizing stories and selected court decisions in which other officers were able to escape responsibility for shooting unarmed subjects.

d.    The City emphasized stories of officers that were assaulted who failed to respond with deadly force, and the City criticized such officers for failing to respond with deadly force, thus improperly encouraging the City's officers to use deadly force.

e.    The City instructed officers to ignore adherence to a use of force continuum because such continuums "plant" a "seed of hesitation." Instead, the City taught that officers should not to hesitate to shoot to kill.

      f.     The City emphasized that officers need not exhaust lesser force options before using deadly force.

      g.     The City instructed officers that they need not retreat even if retreat is readily available.

35.     The City's policies and training in effect at the time of Paul's death demonstrated deliberate indifference to the rights of the inhabitants of Wichita, Kansas.

36.     The City failed to adopt policies or train its officers in order to avoid police shootings such as the shooting of Paul (and instead had in place policies and training that encouraged such shootings). This failure to act was the result of deliberate indifference to the rights of the inhabitants of Wichita, Kansas.

37.     The City's inadequate internal accountability measures contributed to the pattern and practice of excessive use of force by the City's officers, including the officers who tased and shot Paul.

38.     The City's documentation of use of force incidents was directed towards protecting the officer and City involved rather than documenting what took place.

39.     The City labels officer involved shootings as "justifiable" prior to any actual investigation being conducted.

 40.     Investigations regarding an officer's use of force are conducted with the predetermined goal of clearing the officer as opposed to gaining a full understanding of the incident.

41.     The City systemically fails to act reasonably to reconcile any inconsistencies between the physical evidence and an officer's version of the events concerning the use of force.

42.     The City systemically fails to act reasonably to reconcile any inconsistencies between the versions of witnesses and an officer's version of the events concerning the use of force.

43.     The City does not require the collection and preservation of evidence regarding an officer's use of force, canvassing the scene for witnesses, obtaining information from subjects of force, reviewing photographs and other demonstrative evidence, or referring a use of force for administrative or criminal investigation.

44.     The City does not require supervising officers to seriously and objectively review use of force incidents involving officers; instead reviews and paperwork regarding such incidents are typically just "rubber stamped."

45.     The City's Police Department conducts its own investigations into the use of deadly force by its officers and such officers are constantly exonerated and the use of force by officers is constantly found to have been "reasonable" or "justified."

46.     There is no legitimate external investigation into the excessive use of force by the City's officers.

47.     The City's Citizen's Review Board (established in 2006 after the wrongful beating and hospitalization of Jason Price by a City officer in 2006) rarely meets and lacks any real investigative authority or power.

48.     The City has failed to address the problems with excessive force prevalent amongst its officers.

49.     The failure of the City to address the excessive force problems has sent a message to officers, including the officer who shot and killed Paul, that such behavior is acceptable and thus contributed to the further use of excessive force by officers and was a moving force of the shooting and death of Paul.

50.     The City failed to provide its officers, including the officer who shot and killed Paul, with the operational guidance needed to limit the use of deadly force within the bounds of the constitution.

51.     The City's policies and customs authorizing and approving the use of deadly force by City officers even in the absence of an actual, immediate threat was a moving force of the shooting and death of Paul.

52.     The City's policies and customs as to the training and guidance of its officers with regard to the use of deadly force was a moving force of the shooting and death of Paul.

53.     Long before Paul was shot, the City knew or should have known that its practices and procedures were resulting in the unnecessary shooting of citizens, including unarmed citizens.

54.     The City's emphasis and reliance on the use of force to compel submission created a culture of militarized aggression within the City Police Department which has contributed to excessive force incidents, including the shooting and death of Paul.

55.     The City had actual or constructive notice that its action or failure to act was substantially certain to result in constitutional violations, and the City consciously or

deliberately chose to disregard the risk of harm, as evidenced by the pattern of tortious conduct.

56.     Information on shootings involving the City's officers (and in particular information regarding the identity of the officers involved) is extremely difficult to obtain because a significant component of the City's policy regarding the use of deadly force by officers is to refuse to release information regarding a shooting by one of its officers unless it is derogatory information regarding the person shot by the officer.

57.     The City refuses to release the names of officers involved in shooting incidents.

58.     The City's policy of not releasing information on the officers involved in a shooting creates a veil of secrecy surrounding the shootings that casts doubt on the investigation into the shootings because there is no means of verifying or refuting findings that a use of force was supposedly reasonable.

59.     On November 5, 2010, after being called for a loud noise complaint, a City officer shot and killed Jerome Dixon in the doorway of his home. The City refused, per City policy, to identify the officers involved until ordered to do so by a court. The City immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

60.     On November 12, 2010, City officers shot and killed Robert Scharoun in the driveway of his home. The City refused, per City policy, to identify the officers involved.

The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

61.     On October 31, 2011, City officers shot and killed Dejuan Colbert, striking him with 35 shots. The City refused, per City policy, to identify the officers involved. The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

62.     On March 10, 2012, City officers shot and killed Marquez Smart, shooting him 5 times in the back. The City said Mr. Smart shot twice into a crowd even though Mr. Smart did not have any gunpowder residue on his hands. The gunpowder stippling and "bullet wipe" on his clothes where he was shot in the back indicates Mr. Smart was shot at close range. At least one witness states that Mr. Smart had submitted to authority and was lying on the ground when he was shot by City officers. The City refused, per City policy, to identify the officers involved. The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The

City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

63.     On April 1, 2012, City officers shot and killed Troy Lanning, II. Mr. Lanning was shot after he allegedly reached into a bag for a weapon. No weapons were found on or near Mr. Lanning. The officer that shot and killed Mr. Lanning was also involved in a 2008 shooting and has since been removed from street duty because he is believed to have lied about a third shooting. The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved for this shooting; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

64.     On April 13, 2012, City officers shot and killed Timothy Collins. Officers alleged Mr. Collins was involved in a burglary and robbery and came running out of a house with two others who were alleged to have been armed. The police do not appear to have given warnings prior to shooting Mr. Collins. Mr. Collins was not believed to be armed when he was shot. The City refused, per City policy, to identify the officers involved. The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision

or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

65.     On April 10, 2014, a City officer shot and killed David Zehring. Sedgwick County Sheriff's Deputies had already tasered Mr. Zehring but the City's officer on the scene shot Mr. Zehring several times, killing him. The City is believed to have immediately labeled the shooting as a "justifiable shooting" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

66.     On July 10, 2012, City officers shot and killed Karen Jackson.  Ms. Jackson was known to the officers to be mentally ill. Ms. Jackson was physically handicapped and moved with a noticeably awkward gait. The officers escalated the situation—screaming at Ms. Jackson with their deadly firearms out and aimed at her—and failed to attempt appropriate de-escalation tactics. At no time prior to being shot and killed did Ms. Jackson try to attack or threaten the officers. Because Ms. Jackson "took one more step," the officers shot and killed her, never even attempting to use their Tasers, even though Ms. Jackson did not pose an immediate threat to any officer or anyone else. Per City policy, the City has never publicly released the identity of the officers responsible. The City is believed to have immediately labeled the shooting as a "justifiable homicide" and framed their subsequent investigation based on that label. The City failed to discipline any officer involved; failed to

consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

67.    On July 4, 2014, City officers shot and killed Icarus Randolph, after Randolph's family had called 911 for an ambulance to take the mentally ill Randolph to the hospital. According to a claim filed by Randolph's family against the City, when Randolph exited the house, walking aimlessly and with a vacant expression, one of the City officers moved into Randolph's path, fired his Taser at Randolph, "rapidly dropped" the Taser, and then fired four rounds from his handgun without pause at close range at Randolph's midsection. Although a knife was reportedly found near Randolph's body, the family's claim states that "none of the family saw it in his hand when he came out of the house before he was shot." The family alleges in a lawsuit that one of the City's officers tampered with evidence at the scene before detectives arrived. The City is believed to have immediately labeled the shooting as a "justifiable shooting" and framed the subsequent investigation based on that label. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

68.    On January 13, 2012, City officers shot and wounded Shirley Smith. In a news interview, Ms. Smith described the incident as follows:

Tasha and Shirley Smith both said they had their hands up when police intervened.

"I didn't have anything in my hand," Shirley said.

The only object in the area was Tasha's cellphone, which was on the ground, Tasha and Shirley said.

But Shirley Smith said one of the officers shot her in the left side.

"I asked him, 'What the … did you shoot me for?'" she said. "He said, 'Because you were going after that lady.' I wasn't. I was standing back.

"Did he tase me? Did he mace me? No, he shot me with a 9 millimeter.

"They know I didn't have a weapon. I think the reason he shot me was for crowd control."

The Smiths and neighbors said 20 to 30 people were gathered around the incident.

Rick Plumlee, *Woman shot by police plans to sue city of Wichita: A 53-year-old grandmother said she plans to sue the city of Wichita because a police officer shot her when she claims she was unarmed and not threatening anyone*, THE WICHITA EAGLE (March 1, 2012). Per City policy, the identity of the officer involved was not publicly released. The City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

69.    On February 25, 2014, City Officers shot Stacy Richard 19 times in his home after the police were called by a licensed therapist alleging her patient, Mr. Richard, was threatening to kill himself. The City officers failed to call their Crisis Intervention Team Officers and entered the premises within approximately 10 minutes of arriving despite Mr. Richard being by himself in the premises. The City has never publicly released the identity of the officers responsible. The City is believed to have immediately labeled the shooting as a "justifiable shooting" and framed their subsequent investigation based on that label. The

City failed to discipline any officer involved; failed to consider much less make any changes to its officer training, supervision or operational polices; failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

70.     The above-listed incidents are just examples. The City's police officers have been involved in additional shootings and numerous other incidents involving excessive use of force since 2010 other than those listed above but the facts of those incidents remain a mystery because of the City's code of silence.

71.     Well before Paul was shot and killed, the City has been repeatedly placed on actual or constructive notice of the inadequacy of its existing policies, practices, customs and procedures by complaints, claims and lawsuits filed against the City concerning the excessive use of force by its officers.

72.     On September 17, 2013, *Jackson et al. v. City of Wichita et al.*, was filed in Sedgwick County District Court (the case was later removed and is No. 13-CV-1376-RDR-KGS in the United States District Court for the District of Kansas). The suit arises from the shooting death of Karen Jackson, referenced above.

73.     The *Jackson* complaint listed for the City's benefit numerous officer involved shooting incidents since 2010, many of which clearly involved circumstances raising questions as to whether the force used was reasonable or justified.  The complaint also detailed inadequacies with and the need for change to the City's training, supervision and operational policies regarding the use of force by City officers.

74.     Among other things, the *Jackson* complaint also placed the City on notice of the following facts (using 2012 numbers as an example):

a.     "Wichita's officer to shooting death ratio is one (1) death for every 129 officers, which is 13.6666 times greater than the national average."

b.     "Despite having nearly twice the population of Wichita, and more than three (3) times the number of police officers, Detroit only had three (3) officer-involved shooting deaths in 2012." "Detroit has one (1) shooting death to every 920 police officers, which is nine (9) times less than the ratio for Wichita."

c.     "Even though Chicago has approximately eight (8) times as many people as Wichita, and twenty (20) times as many police officers, the ratio of shooting death to police officers in Wichita (1/129) is nearly twelve times greater than the ratio in Chicago (1/1511)."

75.     The City has ignored the obvious import of facts showing that the City's police force was grotesquely out of line with the vast majority of other cities with regard to the use of deadly force against its citizens, continued to ignore facts and evidence from officer-involving shootings that contradict the City's conclusions that such incidents are justified, persisted with the same policies, and failed to make timely and sufficient changes to its officer training, supervision or operational polices regarding the use of deadly force by City officers.

76.     On March 7, 2014, *Estate of Smart et al. v. City of Wichita et al.,* No 14-cv-02111-EFM-JPO, was filed in the United States District Court for the District of Kansas. The suit arises from the shooting death of Marquez Smart, referenced above.

77.     According to the *Estate of Smart* lawsuit, and contrary to police claims that Smart

had fired a gun at a crowd, Smart was unarmed. The complaint alleges, in part:

> "Officer reports indicate that there was a gun found in the alleyway, a substantial
> distance from the man who was shot."

> "The location of the gun found in the alleyway is directly below the large openings
> in the wall behind [officer] Froese's parked patrol car."

> "A witness who was near Officer Chaffee states that there was no handgun in or near
> the hands of the wounded man Chaffee had shot."

> "The witness further states that he observed Officer Chaffee fire his handgun "2-3"
> times into the back of the wounded man in the alleyway, despite the man being
> completely submissive."

> "The witness states that the distance from Chaffee to the man he killed when he fired
> his handgun was approximately from five to seven feet."

> "When the witness questioned Officer Chaffee's actions in shooting the man, the
> witness and another person who had been standing nearby were told by Officer
> Chaffee, in a profane manner, to leave the area."

> "The two witnesses complied with the order and were never interviewed or contacted
> by anyone from the Wichita Police Department in the investigation following the
> event."
> […]

> "There was no gunshot residue test performed on Marquez Smart's hand although
> they had been bagged for the purpose of performing such a test. Such a test would
> have conclusively proven whether his hands were in the presence of a firearm being
> discharged or not."

78.     Despite the disturbing facts recounted in *Estate of Smart*—if only with regard to how

the officers behaved with witnesses and how the City behaved with the physical evidence

*after* the shooting—the City treated the matter as business as usual: ratify, deny, defend. The

City failed to discipline any officer involved; failed to consider much less make any changes

to its officer training, supervision or operational polices (including with regard to witnesses

and physical evidence from the scene of an officer involved shooting); failed to genuinely question or investigate the propriety of the use of deadly force; and attempted to hide and protect from public disclosure the identity and role of any officer involved.

79.     On March 28, 2014, *Herington et al. v. City of Wichita et al.*, No. 14CV01094 MLB KMH, was filed in the United States District Court for the District of Kansas. The suit arises from the shooting death of Troy Lanning, II, referenced above.

80.     The *Herington* complaint listed numerous City officer-involved shooting incidents since 2010, many of which clearly involved circumstances raising questions as to whether the force used was reasonable or justified. The complaint detailed inadequacies with and the need for change to the City's training, supervision and operational policies regarding the use of force by City officers.

81.     The *Herington* complaint, like the *Jackson* complaint, also pointed out that City officers were shooting and killing citizens at a high rate that is far out of line with other cities.

82.     On August 15, 2014, *McIntosh v. City of Wichita et al.,* No.: 14 CV 02402-DDC-TJJ was filed in the United States District Court for the District of Kansas. The lawsuit concerns an officer first tasing and then brutally beating, kicking and punching a man, for more than a minute, who had apparently committed a parking infraction.

83.     The plaintiff in *McIntosh* never attacked the officer in any way and never resisted (even while being beaten, kicked and punched by the officer).

84.     Although the defendant/officer in *McIntosh* allegedly had a prior history of anger problems, violent behavior, and using excessive force, the City had retained the officer on

its force and failed to address the problem. In fact, after the incident giving rise to the lawsuit, the officer was *promoted* by the City to police detective.

85.     The City ultimately settled the *McIntosh* lawsuit for $325,000.

86.     The circumstances surrounding the *McIntosh* case are just one more instance of the City blindly ratifying, condoning and defending the excessive use of force by its officers rather than trying to remedy the ongoing problem. The message to other officers for the City was, yet again: if you use excessive force, don't worry; you will not be meaningfully disciplined or criticized, you will not be seriously interrogated or investigated, and your role will likely be kept secret. And, apparently, you might even get promoted.

87.     The above-listed lawsuits are just examples. The City and its police officers have been the subject of other complaints, claims, and lawsuits that have been filed against the City and its officers concerning the excessive use of force by City officers.

88.     Together, the complaints, claims and lawsuits filed against the City and its officers concerning the excessive use of force by its officers placed the City on actual or constructive notice that its existing policies, practices, customs and procedures regarding the use of force by officers were inadequate to protect the constitutional rights of the citizens of Wichita.

89.     Additionally, and also well before Paul was shot and killed, community service organizations, local activists, and other interested citizens of Wichita had also placed the City on actual or constructive notice that its policies, practices, customs and procedures regarding the use of force by officers were inadequate to protect the constitutional rights of citizens and needed to dramatically change.

90.    Public protests in Wichita by citizens complaining about City officer involved shootings began occurring—and receiving local medial coverage—with increasing frequency in the summer of 2012.

91.    For example, a July 2012 story by local NBC affiliate KSN reported:

> With homemade drums, pointed signs and loud chants protestors outside City Hall Monday had a message to deliver to the Wichita Police Department. "This is completely out of control. The killings are an epidemic and they need to stop," said protester, Janice Bradley.
>
> After the fifth fatal officer-involved shooting this year, members of the community are joining forces to say there are better ways to enforce the law.
>
> […]
>
> The protesters are now demanding the ouster of Chief Norman Williams, who they say justifies all officer-involved killings no matter the circumstances. "We want the names released of these officers. We want to find out who's doing this," said Bradley.
>
> They're frustrated citizens who say they won't stop until the killings do.

KSN, *Protesters demand officer-involved shootings stop,* published online July 16, 2012, 2013 at ksn.com (available online at http://archive.is/531Tt).

92.    At a July 2012 press conference, Wichita Police Chief Norman Williams acknowledged that the number of officer-involved shootings in the City was a "disturbing trend."

93.    Community complaints regarding the number of officer involved shootings, how such shootings were handled by the City, how minorities in the community were treated by the police, a general need to dramatically reform the City police, and even increasing calls

for the City's Chief of Police to be replaced were well-publicized in local media in Wichita throughout 2012, 2013 and 2014.

94.     Growing mistrust of the City police and rising frustration with the City's lack of transparency regarding officer involved shootings led to demands that the City place body cameras on all its officers. "No Camera, No Gun" read signs held by concerned citizens outside City Hall and elsewhere.

93.     After Michael Brown, an unarmed black teenager, was shot and killed on August 9, 2014 by a white police officer in Ferguson, Missouri, the citizens of one city in the country would soon feel the need to respond with a grassroots movement called #NoFergusonHere: Wichita.

94.     On August 13, 2014, Wichita State University hosted the U.S. Attorney's Fourth Annual Statewide Civil Rights Symposium. At the symposium, it was suggested that if body cameras were worn by the City's police officers it would help with issues of misconduct by City officers. Wichita Police Chief Norman Williams responded that it would be very expensive to provide body cameras for all officers. U.S. Attorney Barry Grissom "suggested that the community join in demanding funding for the cameras, saying that the cost of one excessive-force lawsuit against the city would probably pay for the equipment."  Tim Potter, *Wichita attendees hear that civil rights is ongoing battle,* THE WICHITA EAGLE (August 13, 2014).

98.     The day after the symposium on civil rights, Wichita Police Chief Norman Williams announced he was retiring.

99.     The Wichita Eagle's discussion of the chief's retirement announcement included the

following:

> Williams did not […] respond to questions about whether his retirement was
> spurred in part by pressure from local groups unhappy over numerous recent
> deadly officer-involved shootings and persistent evidence of racial profiling
> by officers.

> Bonita Gooch, who had called for Williams to step down in recent columns in
> the Community Voice, said frustration with the chief was growing in
> Wichita's African-American community.

> "I've been waiting to see some changes, and it didn't look like they were
> coming," Gooch said.

> In a recent column, Gooch wrote "I think it's time for change and the change
> I'm talking about is at the top. No, not the mayor; the top of the Wichtia
> Police Department. The buck stops where – with Police Chief Norman
> Williams.  "But we're at fault, too. We've let him get away with it for far too
> many years."

> Mike Shatz, editor of the online publication Kansas Exposed, said his greatest
> frustration with the outgoing chief was "his failure to address the (alleged
> police) misconduct in a transparent way..."

> Shatz said he'll be watching closely to see who Williams' successor will be.
> "Is the next chief going to enact change that brings transparency and
> accountability to the department?" he asked.

> […]

> Djuan Wash, communications director for Sunflower Community Action,
> said Williams' retirement doesn't automatically mean significant changes are
> coming.

> "We look forward to having a conversation with the community and with
> Robert Layton in terms of what's next," Wash said. "Even though he
> (Williams) is gone, that doesn't mean policy change."

> Numerous officer-involved shootings – including eight armed confrontations
> over a ninemonth period spanning late 2011 and much of 2012, in which five

people were killed and nine were injured – have damaged the community's relationship with the police, he said.

"The officer-involved shootings and the responses are a concern to us," Wash said.

Stan Finger, *Wichita Police Chief Norman Williams to retire*, THE WICHITA EAGLE (August 14, 2014).

100.    Sadly Mr. Wash was correct, and Williams' retirement did not "automatically mean significant changes are coming."  In fact, no significant changes came before Paul was shot and killed.

101.    On August 28, 2014, more than 600 people gathered in Wichita to meet with City officials and discuss their concerns regarding City procedures on police shootings, placing body cameras for officers, hiring practices within the police department, and police transparency and accountability.

102.    The panel for the #NoFergusonHere meeting included Wichita Mayor Carl Brewer, City Manager Robert Layton, and Wichita Interim Police Chief Nelson Mosley.

103.    On August 31, 2014, the Wichita Eagle reported that "[t]he confluence of [Chief Williams's] retirement, the Aug. 9 police shooting death of an unarmed black teenager in Ferguson, Mo., and ***ongoing criticism of officer-involved shootings in Wichita*** has created a local outcry for community discussion." Rick Plumlee, *Community leaders want diverse viewpoints in seeking new Wichita police chief,* THE WICHITA EAGLE (August 31, 2014) (emphasis added).

104.   On December 10, 2014, another #NoFergusonHere meeting with Mayor Brewer, City Manager Layton, and Interim Police Chief Mosley and others was attended by 200 people:

> On Wednesday, the public continued to demand officers receive crisis invention training, an improvement in community policing policies and for creation of a citizen review board with subpoena power.
>
> […]
>
> Some participants said they were angered that there has not been a grand jury called to decide whether to indict Wichita police officers involved in shootings and that the police department has not made quicker strides toward training its officers in how to handle calls involving people with mental illnesses.
>
> Others called for a police force that mirrors the racial makeup of the city.
>
> […]
>
> One man asked why police who use excessive force on residents who have already been subdued haven't been fired. He specifically mentioned officers using Tasers on people who are already lying on the ground. "Most of the cops on the force are good people who I can respect. But we got some bullies and sadists," he said. "… They got to go."

Amy Renee Lieker, *Community meeting with police draws 200 people to Century II,* THE WICHITA EAGLE (December 10, 2014).

105.   Prior to Paul's shooting and death, the City made no serious effort to change its relevant policies, practices, procedures and customs regarding deadly force despite scrutiny and criticism from all corners; despite officer shooting and killing rates far out of line for a city of its size; despite a persistent problem of officers using excessive force; despite known problems with how officers were interacting with and profiling black and Hispanic citizens; despite a series of civil rights lawsuits detailing the problems; despite knowing that its training and procedures regarding crisis situations were inadequate; despite community frustration, protests and calls for dramatic change; and despite a U.S. Attorney and others

suggesting the community put pressure on the City to equip all officers with body cameras to address the public's lack of trust and confidence in the police force.

106.    The City continued to focus any "reform" efforts on escaping responsibility for use of force incidents rather than improving its failed approach to the use of force.

107.    When the City retained an "expert" to examine its police policies, the City retained a lawyer specializing "in the area of operational *liability*," focused on proposals that would help establish "*justification* of the officers' use of force" rather than seriously considering ways of less frequently resorting to the use of deadly force, and delayed taking serious action on proposals actually directed at less frequently resorting to deadly force.

108.    In January of 2015, when Officer Jane Doe made the decision to shoot Paul and then to shoot Paul again, Officer Jane Doe had been trained and supervised according to and understood that the City's widespread practice, so well settled as to constitute custom or usage with force of law, was to authorize the use of deadly force whenever an officer could imagine a situation potentially escalating into an immediate and significant threat to the safety of an officer or others, *i.e.,* to use deadly force whenever the officer believes there is a theoretical threat-of-a-threat rather than an actual threat.

109.    In January of 2015, when Officer Jane Doe made the decision to shoot Paul and to shoot Paul again, Officer Jane Doe knew that under the City's widespread practice, so well settled as to constitute custom or usage with force of law, the City would not meaningfully punish or discipline her for shooting (beyond the formality of a <u>paid</u> "administrative leave"), the City would not genuinely question or investigate the propriety of shooting, and the City would work to hide and protect from public disclosure her identity and role in shooting.

**B.**     **The unlawful shooting and killing of Paul Quintero.**

110.    At all times material herein, officers John Doe and Jane Doe were acting under the authority or color of state law as they were acting in the course and scope of their employment with the City as police officers.

111.    At about 6:43 pm on January 3, 2015, Wichita 911 operators received a call of a disturbance with a knife at the residence of 554 North Oliver.

112.    The first 911 caller reported that her nephew, Paul, was under the influence of alcohol and had a knife.

113.    During the same phone call, the same 911 caller then reported that "my brother got him [Paul] back in the car. Got him out of the house and put him back in the car," "his dad put was able to put him back in the vehicle" and "[t]hey're in the car now" in the driveway, "[a] gray or blue Tahoe."

113.    Plaintiff also called 911, concerned about fighting inside the house, but then reported to the 911operator that his son was out of the house now and thus ended his call.

114.    A third 911 call from inside the house stated that no one was injured.

115.    Two City police officers, Officer John Doe and Officer Jane Doe, were sent.

116.    The officers arrived in the area at around 6:51 pm.

117.    The officers chose to park some distance away and stealthily approach on foot.

118.    When the officers arrived, Paul and his father (Plaintiff) were sitting in Plaintiff's car, parked in the driveway of the residence.

119.    Paul was not armed with any kind of weapon.

120.    Paul was not carrying or concealing on his person any type of weapon.

121.    Officer John Doe and Officer Jane Doe approached the vehicle and ordered Paul and his father, the Plaintiff, to exit the vehicle.

122.    Paul and Plaintiff exited the vehicle.

123.    Paul was not carrying a knife or a gun or any other type of weapon when he exited the vehicle.

124.    Paul never physically threatened any of the officers.

125.    Paul never verbally threatened to harm or attack any of the officers.

126.    Paul never attacked or assaulted any of the officers, or made any attempt to do so.

127.    Paul never lunged at or moved towards the officers in any threatening manner.

128.    The only "threat" Paul Quintero made of any type towards the officers was—after one of the officers pulled out a Taser gun—a verbal "threat" to bring a lawsuit against the officers if they fired the Taser at him.

129.    Officer John Doe then fired the Taser at Paul.

130.    When the Taser was discharged at Paul, Paul was complying with the instructions of the officers.

131.    When the Taser was discharged at Paul, Paul's empty hands were out and above his waist and fully visible to the officers.

132.    When the Taser was discharged at Paul, Paul was not holding a knife or gun or any other sort of weapon, nor was a knife or gun or any other sort of weapon on his person or within his reach.

133.    Prior to firing the Taser at Paul, the officers did not verbally warn Paul that he would be or was about to be shot with the Taser.

134.    After being hit by the Taser, Paul slightly staggered and his arms lowered.

135.    Only seconds after being hit by the Taser, Paul was then shot by Officer Jane Doe.

136.    Before the Taser had been discharged at Paul, Officer Jane Doe had already pointed her AR-15 assault rifle at Paul.

137.    Precisely as the Taser was designed and intended to do, firing the Taser on Paul caused Paul to lose neuromuscular control and the ability to perform coordinated actions.

138.    Paul's young body was still reacting involuntarily to the Taser's "Neuro Muscular Incapacitation" when Officer Jane Doe shot him twice with her AR-15 assault rifle.

139.    Officer Jane Doe shot Paul twice from behind.

140.    Officer Jane Doe shot Paul twice in his midsection.

141.    When Officer Jane Doe shot Paul twice from behind in the midsection with her AR-15 assault rifle, Paul was not armed.

142.    When Officer Jane Doe shot Paul twice from behind in the midsection with her AR-15 assault rifle, Paul was not fleeing.

143.    When Officer Jane Doe shot Paul twice from behind in the midsection with her AR-15 assault rifle, Paul did not pose an immediate threat to the safety of any officer or to anyone else.

144.    When Officer Jane Doe shot Paul twice from behind in the midsection with her AR-15 assault rifle, there was nothing in Paul's "waistband" but his waist.

145.    After Tasing Paul and shooting Paul twice in the midsection with an assault rifle, the officers provided no first aid or other care for Paul.

146. After Tasing Paul and shooting Paul twice in the midsection with an assault rifle, the officers handcuffed Paul as he lie on the driveway bleeding.

147. Paul was provided no assistance of any kind until EMS arrived.

148. It is believed that Paul's family inside the house—and not the officers—first reported to 911 that Paul had been shot and needed medical attention.

149. Plaintiff, Paul's father, endured witnessing all of this, and the officers prevented Plaintiff from being with his dying son.

150. According to the Sedgwick County Autopsy Report, Paul "died as a result of gunshot wounds to the trunk" and "[t]he manner of death is homicide."

151. A press release issued by the City regarding the shooting of Paul claims that, after the Taser was fired at Paul, Paul supposedly "takes one step towards officer A" and "Officer B [claims that she] sees the suspect reach towards his waistband"; "This is when Officer B fires two shots from her patrol rifle."

152. A step to maintain one's balance and a dropping of the arms would be expected, normal, and foreseeable responses to being struck by a Taser.

153. The claim by Jane Doe that Paul reached towards his waistband is simply an after-the-fact attempt to fabricate "threatening" behavior by Paul.

154. After shooting Paul, the officers found no weapon of any sort on Paul; there was **nothing** at all for Paul to reach for in his "waistband."

155. Paul was **not** reaching for his (empty) "waistband " when Officer Jane Doe shot Paul twice from behind in the midsection with her AR-15 assault rifle.

156.   "The Waistband Defense"—*i.e.* assertions by police after fatal shootings that an unarmed shooting victim (who is now dead and unable to deny that he was "reaching for his waistband") was supposedly "reaching for his waistband"—has become the absurd and fatal equivalent of "my dog ate my homework."[1]

157.   The Wichita Eagle's January 4, 2015 report of Paul's shooting and death included a statement by eyewitness Dustin Deckard:

**'He had his hands up'**

Dustin Deckard was on his way home from work when he saw the female police officer with her rifle aimed at Quintero. Deckard lives a few blocks away from where the shooting took place.

"It was very eerie, because the shooting must have occurred seconds after," he said. "When I passed, I slowed down, so I only got a couple seconds of a view.

"I saw the passenger; it was clearly a younger man in his early 20s of Hispanic descent, and he was wearing a blue jersey and ***he had his hands up.*** He was behind the SUV, and the female officer was mostly directly in front of him, a little bit to his left. Both the officers were on either side of him, but he was facing the female officer who had her rifle up, and she was looking down the sight."

Deckard was not sure whether police had already used the Taser on Quintero at that point and did not see Quintero's father.

"I wasn't looking for him just because of the gun being out," he said. Deckard saw several more police vehicles approach the scene after he drove away, he said.

---

[1] *See, e.g., Arthur Delaney and Diane Jeanty, Police Shootings of Unarmed Men Often Have Something in Common: The Waistband Defense,* HUFFINGTON POST (December 10, 2014) (collecting recent news accounts of unarmed men shot by police officers) (online at http://www.huffingtonpost.com/2014/12/10/police-shootings_n_6303846.html); *see also* Arthur Delaney, *The Most Dangerous Thing You Can Own Is Your Waistband,* The Huffington Post (updating prior report to include most recent "waistband defense" shootings, including Paul's) (online at http://www.huffingtonpost.com/2015/03/03/waistbands_n_6791990.html).

Kelsey Ryan, *Wichita police: Man shot, killed by officer was 'belligerent,' reaching for his waistband,* THE WICHITA EAGLE (January 4, 2015) (emphasis added).

158.   A January 4, 2015 television news segment on Wichita's ABC affiliate KAKE included an interview with another witness to the shooting and death of Paul:

> Ted McAdams and his wife live in the unit behind where the party was going on. They ran outside after they heard screaming.
>
> "We got to the end of the driveway that the cops had that fella at gunpoint," says McAdams
>
> […]
>
> *McAdams says he thought the situation was then under control.*
>
> *"They said that he was threatening the officers, I don't believe he was," says McAdams. "He was trying to talk to the male officer with compliance trying to tell him, I don't know what all he was saying, but he wasn't resisting or nothing like that from what I could see."*
>
> McAdams says he couldn't believe what followed. The male officer tased Quintero, but McAdams tells me he didn't fall to the ground.
>
> "*He had his arms up until he got tased, his arms went down to his side*."
>
> *Police say Quintero then reached toward that officer's waistband,* <u>*something McAdams says he never saw*</u>. The female officer then fired two shots from her rifle.
>
> "If he was told to do something, yeah he should've done it, but that officer had, to my advice and my suggestion, *she shouldn't have ever shot him*."
>
> Quintero died a few hours later at the hospital. McAdams says he's not alone in thinking this situation was taken too far.
>
> "After that all the neighbors and I threw a little fit at the cops because I've got a wife and a newborn and the safety issue and not just that, the way the cops handled themselves."

Ben Jordan, *Witness to officer-involved shooting questions decision to open fire,* KAKE.com (January 4, 2015) (emphasis added).[2]

159.    On August 13, 2015, the City refused to identify the officers involved in the shooting and death of Paul, asserting there was an "open" investigation

160.    ***Eights months earlier***, shortly after the shooting took place—at least by January 13, 2015 and probably sooner—the City had ***already*** labeled the shooting and death of Paul a "***justifiable*** homicide."

161.    The City has provided a version of the City's "Public Incident Report" for the shooting and death of Paul that is, for all practical purposes, ***entirely redacted*** and has refused to provide an unredacted version of the report.

162.    The State of Kansas has also refused to provide information identifying the officers involved in the shooting of Paul and has refused to provide any other information regarding Paul's shooting and death without a court order to do so.

## V.  FEDERAL CIVIL RIGHTS CLAIMS

163.    The Civil Rights Act, codified as 42 U.S.C. § 1983, provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom or usage, of any state or territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any laws, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

---

[2] Available online at http://www.kake.com/home/headlines/Witness-to-officer-involved-shooting-questions-decision-to-open-fire-287473321.html

164.    Plaintiff alleges that Defendants, jointly and/or severally, deprived the Decedent Paul of his Fourth Amendment rights, and those rights, privileges, and immunities secured by the Fifth and Eighth Amendments to the Constitution as incorporated and applied to the states through the Fourteenth Amendment.

165.    Defendants violated Paul's rights in one or more of the following ways:

(a)     By using excessive and deadly force in the course of Officer Jane Doe's attempt to seize Paul, in violation of the Fourth Amendment and its reasonableness standard. Plaintiff pleads that Paul was unlawfully shot and killed. This action resulted directly and only from a use of force that was clearly excessive to the need, and was objectively unreasonable;

(b)     By failing to provide medical attention, where it was clearly necessary and required by law;

(c)     By authorizing such incidents of excessive force;

(d)     By maintaining or allowing policies and customs which condoned or encouraged the use of excessive force; and

(e)     By failing to provide supervision and/or proper training to prevent such incidents of excessive force.

166.    Defendants' violations of Paul's constitutional rights resulted in Paul's suffering and death and were a direct cause of the injuries and damages alleged herein.

**COUNT ONE:**
**42 U.S.C. § 1983— PEACE OFFICER LIABILITY**

167.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.  Plaintiff brings a claim against Officer Jane Doe, individually as well as in her official capacity, pursuant to 42 U.S.C. § 1983 and for punitive damages.

168.    At all material times, Officer Jane Doe was acting under color of state law as an agent and employee of the City. Officer Jane Doe was wearing her official Wichita Police Department uniform, and was acting in the course and scope of her duties as a Wichita Police Officer at the time she shot and killed Paul.

169.    It was clearly established well before January 3, 2015, that it is an unreasonable and excessive use of force for a police officer to shoot a suspect who is not only not fleeing but also does not pose any imminent threat of harm to any officer or the public.

170.    Officer Jane Doe shot Paul twice from behind with her AR-15 assault rifle even though he was not only not fleeing but did not pose any imminent threat of harm to any officer or to the public.

171.    Summarizing facts set forth more fully above and incorporated herein:

a.    When the officers arrived, Paul was no longer even inside the house much less fighting or arguing with anyone; instead, Paul was sitting inside his father's car with his father and talking with his father.

b.    The officers had **not** been informed that anyone in the house had been injured.  On the contrary, at least a 911 operator (and likely the officers) had been told by someone calling from inside the house that no one had been injured.

c.    At no time while the officers were present did Paul pose an imminent threat to the safety of the police or others.

37

d.      At no time while the officers were present did Paul resist arrest or attempt to flee the scene.

e.      At no time while the officers were present was Paul armed with any kind of weapon.

f.      Paul never physically threatened any of the officers, never verbally threatened to harm or attack any of the officers, never attacked or assaulted any of the officers or made any attempt to do so, and never lunged at or moved towards the officers in any threatening manner.

g.      When Office John Doe discharged a Taser at Paul, Paul was complying with the instructions of the officers, Paul's empty hands were out and above his waist and fully visible to the officers, Paul was not holding a knife or gun or any other sort of weapon (nor was a knife or gun or any other sort of weapon on his person or within his reach), and the officers did not verbally warn Paul that he would be or was about to be shot with the Taser.

h.      As the Taser was designed and intended to do, firing the Taser on Paul caused Paul to lose neuromuscular control and the ability to perform coordinated actions; Paul slightly staggered and his arms lowered.

i.      A step to maintain one's balance and a dropping of the arms would be expected, normal, and foreseeable response to being struck by a Taser.

j.      While Paul's young body was still reacting involuntarily to the Taser's "Neuro Muscular Incapacitation," Officer Jane Doe, without warning, shot him with her AR-15 assault rifle, from behind, twice, in his midsection.

k.      When Officer Jane Doe shot Paul twice, Paul was not armed, was not fleeing, was not resisting, and did not pose an immediate threat to the safety of any officer or to anyone else.

l.      When Officer Jane Doe shot Paul twice, Paul was not "reaching for his waistband" and, in fact, there was nothing in Paul's "waistband" but his waist.

m.      After tasing Paul and shooting Paul twice in the midsection with an assault rifle, the officers handcuffed Paul as he lie on the driveway bleeding; provided no first aid, care or assistance whatsoever to Paul; and prevented Plaintiff from being with his son.

172.   Considering the totality of the circumstances from the perspective of Officer Jane Doe at the time of the incident, she could not reasonably conclude that Paul posed an immediate threat to the safety of the officers or others.

173.   It was unreasonable for Officer Jane Doe to seize the unarmed, nondangerous Paul by shooting him dead.

174.   Officer Jane Doe did not have probable cause to believe that Paul posed a threat of serious physical harm, either to herself or to others.

175.   No reasonable officer would have shot Paul under the circumstances.

176.   In any event, Officer Jane Doe's reckless and deliberate conduct created any situation that she may claim created probable cause for the use of deadly force.

177.   By using unreasonable deadly force while acting under color of state law, Officer Jane Doe violated Paul's rights under the United States Constitution and caused his injuries and wrongful death and is liable to Plaintiff for all damages alleged herein and punitive damages.

## COUNT TWO:
## 42 U.S.C. § 1983—MUNICIPAL LIABILITY FOR POLICY OR CUSTOM

178.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.  Plaintiff brings this claim against Defendant the City of Wichita ("City") under 42 U.S.C. § 1983.

179.    The unconstitutional shooting and death of Paul was caused by a municipal policy or custom of the City.

180.   At all times material herein, the City's widespread custom and practice, so well settled as to constitute custom or usage with force of law, was to authorize the use of deadly force *whenever* an officer could imagine a situation *potentially* escalating into an immediate and significant threat to the safety of an officer or others, *i.e.,* to use deadly force whenever there is a threat-of-a-threat rather than only when there is an actual threat.

181.   The City was on actual or constructive notice that its custom/practice (i.e., authorizing officers to use deadly force *whenever* an officer imagines a threat-of-a-threat rather than only when there is an actual threat) posed a substantial risk of subjecting people the police were likely to come into contact with (such as Paul) to unreasonable and excessive uses of deadly force by City officers yet the City was deliberately indifferent to that risk.

182.   In January of 2015, when Officer Jane Doe made the decision to shoot Paul and then made the decision to shoot Paul again, Officer Jane Doe had been trained and supervised according to and understood the City's widespread custom and practice, so well settled as to constitute custom or usage with force of law, to authorize the use of deadly force whenever

an officer could imagine a situation potentially escalating into an immediate and significant threat to the safety of an officer or others, *i.e.,* to use deadly force whenever the officer believes there is a theoretical threat-of-a-threat rather than an actual threat.

183.    The City's widespread custom/practice, so well settled as to constitute custom or usage with force of law, authorizing the use deadly of force whenever an officer perceived a theoretical threat-of-a-threat rather than any actual threat was a moving force of the shooting, injuries and death of Paul.

184.    Additionally and alternatively, at all times material herein, the City's widespread custom/practice, so well settled as to constitute custom or usage with force of law, was to always approve, ratify and defend the use of deadly force by City police officers regardless of whether circumstances raised questions about whether there had been any actual, immediate threat to safety by: (1) consistently and systematically failing to discipline, criticize or seek to change such conduct; (2) consistently and systematically failing to genuinely question or investigate the propriety of such conduct; (3) consistently and systematically working to hide and protect from public disclosure the identity and role of officers involved in such conduct; and (4) always determining that the use of deadly force was justified regardless of the circumstances.

185.    The City was on actual or constructive notice that its custom (*i.e.*, consistently and systematically failing to discipline, criticize or seek to change such conduct; failing to genuinely question or investigate the propriety of such conduct; working to hide and protect from public disclosure the identity and role of officers involved in such conduct; and always determining that the use of deadly force was justified regardless of the circumstances) posed

a substantial risk of subjecting people that the police were likely to come into contact with (such as Paul) to unreasonable and excessive uses of deadly force by City officers yet the City was deliberately indifferent to that risk.

186.    In January of 2015, when Officer Jane Doe made the decision to shoot Paul and then made the decision to shoot Paul again, Officer Jane Doe knew that under the City's widespread custom/practice, so well settled as to constitute custom or usage with force of law, the City would not meaningfully punish or discipline her (beyond the formality of a paid "administrative leave") for shooting  Paul, the City would not genuinely question or investigate the propriety of shooting Paul, the City would work to hide and protect from public disclosure her identity and role in shooting Paul and the City would determine that her shooting was justified.

187.    Officer Jane Doe's knowledge of and the existence of the City's widespread custom/practice, so well settled as to constitute custom or usage with force of law, to not meaningfully punish or discipline for excessive force shootings (beyond the formality of a paid "administrative leave"), to not genuinely question or investigate the propriety of shootings, to work to hide and protect from public disclosure officers' identity and role in shootings and to always determine that deadly force shootings are justified was a moving force behind the shooting, injuries and death of Paul.

188.    Because a City policy or custom was a moving force of the officer's unconstitutional shooting of Paul, the City is liable for the violation of Paul's rights under the United States Constitution, for Paul's injuries and wrongful death, and for the damages alleged herein.

189.    Additionally and alternatively, at all times material herein, the City had a widespread policy, custom and/or practice, so well settled as to constitute custom or usage with force of law, that encouraged unreasonable and unjustified use of deadly force.  This policy, custom and/or practice was called "threat assessment."  This "threat assessment" policy, custom or practice was that officers were not to hesitate to use deadly force.  The no hesitation shoot-first-ask-questions-later "threat assessment" policy/custom/practice is in contrast to the relatively conservative "continuum of force" approach used by other police forces whereby officers are to gradually increase the level of force in response to the level of force used by a suspect.  The City authorized ahead of time and ratified after the fact unreasonable and unjustified uses of deadly force by having a policy, custom or practice of no hesitation, shoot first, ask questions later.

190.    The City was on actual or constructive notice that its policy/custom/practice (*i.e.*, no hesitation shoot-first-ask-questions-later "threat assessment") posed a substantial risk of subjecting people that the police were likely to come into contact with (such as Paul) to unreasonable and excessive uses of deadly force by City officers yet the City was deliberately indifferent to that risk.

191.    In January of 2015, when Officer Jane Doe made the decision to shoot Paul and then made the decision to shoot Paul again, Officer Jane Doe knew that under the City's widespread policy/custom/practice of encouraging and authorizing before the fact and ratifying after the fact the use of deadly force after a no hesitation shoot-first-ask-questions-later "threat assessment" as opposed to the relatively conservative "continuum of force" approach, so well settled as to constitute custom or usage with force of law, that her use of

deadly force would be considered authorized or justified and that she would not suffer any meaningful punishment or discipline (beyond the formality of a paid "administrative leave") for shooting Paul.

192.   Officer Jane Doe's knowledge of and the existence of the City's widespread policy/custom/practice, so well settled as to constitute custom or usage with force of law, to encourage and authorize before the fact and ratify after the fact the use of deadly force after a no hesitation shoot-first-ask-questions-later "threat assessment" by an officer was a moving force behind the shooting, injuries and death of Paul.

193.   Because a City policy, custom or practice was a moving force of the officer's unconstitutional shooting of Paul, the City is liable for the violation of Paul's rights under the United States Constitution, for Paul's injuries and wrongful death, and for the damages alleged herein.

### COUNT THREE:
### 42 U.S.C. § 1983—MUNICIPAL LIABILITY
### FOR FAILURE TO TRAIN & SUPERVISE

194.    Plaintiff incorporates by reference all other allegations set forth in the paragraphs above.

195.   Plaintiff brings this claim against Defendant the City of Wichita ("City") under 42 U.S.C. § 1983.

196.    The shooting of Paul by Officer Jane Doe was unreasonable, excessive and unconstitutional.   The shooting of Paul arose under circumstances that are usual and recurring circumstances with which Wichita police officers must deal.

197.    The unconstitutional shooting and death of Paul was caused by a failure of the City to properly or sufficiently train and supervise its police officers that amounts to deliberate indifference by the City to the rights of persons with whom the police come into contact, such as Paul.

198.    The improper, lack of or insufficient training and supervision, included, without limitation:  training officers never to hesitate to use deadly force; training officers to shoot first, and ask questions later; training officers to use deadly force *whenever* an officer could imagine a situation *potentially* escalating into an immediate and significant threat to the safety of an officer or others, *i.e.,* to use deadly force whenever there is a threat-of-a-threat rather than only when there is an actual threat; failing to train officers to gradually increase the level of force in response to the level of force used by a suspect; training officers that they will not be seriously investigated or criticized in connection with deadly force shootings; training officers that their identity will be concealed after deadly force shootings; training officers that their use of deadly force will never be criticized; training officers that their use of deadly force will not cause them to suffer any disciplinary action; training officers on how to use unreasonable deadly force and avoid responsibility; scaring officers with other incidents where officers allegedly killed because they did not shoot first and ask questions later; training officers on how to avoid or defeat lawsuits as opposed to how to diffuse situations and avoid the use of deadly force;  failing to train officers regarding

escalating the use of deadly force after a suspect has been tased; as well as the facts regarding training and supervision referenced in this complaint.

199.   The need for more or different training and supervision of officers was so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the City's policymakers can reasonably be said to have been deliberately indifferent to the need.

200.   There was a pre-existing pattern of violations linked to the City's inadequate training and supervision regarding the use of deadly force, some of which are described in this complaint.

201.   The City policymakers continued to adhere to the City's failed approach regarding the use of force by its officers even though the City knew or should have known that's it training and supervision of officers with regard to the use of force was responsible for a pattern of excessive use of force by City officers.

202.   The City's failure to train and supervise officers with regard to the proper use of deadly force was a moving force of the shooting, injuries and death of Paul.

203.   Because the unconstitutional shooting and death of Paul was caused by a failure of the City to properly train and supervise its police officers that amounts to deliberate indifference by the City to the rights of persons with whom the police come into contact, the City is liable for the violation of Paul's rights under the United States Constitution, for Paul's injuries and wrongful death, and for the damages alleged herein.

## VI. KANSAS TORT CLAIMS ACT

204.   Plaintiffs incorporate all preceding paragraphs by reference, as if set forth fully here.

205.   On August 13, 2015, Plaintiff provided notice of claims under the Kansas Tort Claims Act to Defendants as required by K.S.A. § 12-105b.

206.   When either the 120 day period lapses (which counts as a constructive denial of the claim) or if the state claims are denied, whichever is sooner, Plaintiffs will amend this Complaint to include pendant state claims under 28 U.S.C. § 1367.

## VII.  DAMAGES

207.   Plaintiff, individually and as heir to Paul Quintero, deceased, and as administrator of and on behalf of the estate of Paul Quintero, and on behalf of all heirs of Paul Quintero hereby sues for the following damages:   value of the loss of the life of Paul Quintero; medical expenses incurred by Paul Quintero before his death; Paul Quintero's funeral and burial expenses; pain and suffering suffered by Paul Quintero before his death; and mental anguish suffered by Paul Quintero before his death.

208.   Plaintiff, individually and as heir to Paul Quintero, deceased, and as administrator of and on behalf of the estate of Paul Quintero, and on behalf of all heirs of Paul Quintero hereby sues for the following damages suffered by Paul Quintero's parents as a result of Paul Quintero's injury and death:   pecuniary loss; loss of support; loss of companionship; mental anguish; bereavement; loss of society; loss of care; loss of comfort; loss of protection; loss of filial care; loss of affection; bystander mental anguish; lost wages Paul Quintero would have earned; loss of household services.

209.   Plaintiff, individually and as heir to Paul Quintero, deceased, and as administrator of and on behalf of the estate of Paul Quintero, and on behalf of all heirs of Paul Quintero

hereby also sues for punitive damages because Defendants' conduct was grossly negligent, reckless, committed with callous indifference and/or was intentional.

## VIII. ATTORNEYS' FEES

300.   Plaintiff also sues for attorney fees and cost and expenses incurred in prosecuting this action under 42 USC Section 1988 and 42 USC Section 1983.

## IX. JURY DEMAND

301.   Plaintiff asserts his right to a trial by jury.

## X. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays that Defendants be cited to appear and answer herein, and that upon trial hereof, Plaintiff be awarded judgment against Defendants for all damages, punitive damages, attorney fees, and costs as alleged above.

Respectfully submitted,


*s/ Michael Shultz*
Michael Shultz, #23133
SHULTZ LAW OFFICE, P.A.
445 N. Waco
Wichita, Kansas 67202
Telephone: (316) 269-2284
Email:  michael@shultzlaw.net

**ATTORNEYS FOR PLAINTIFF**


**Of Counsel:**
James Craig Orr, Jr.
Texas State Bar No. 15313550
jim@hop-law.com
Heygood, Orr & Pearson
2331 W. Northwest Hwy., 2nd Floor
Dallas, TX 75220
(214) 237-9001
(214) 237-9001 (FAX)
**ATTORNEYS FOR PLAINTIFFS**